UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BW OFFSHORE USA, LLC                                CIVIL ACTION

VERSES                                              NO: 14-1052
                                                    c/w 14-2566

TVT OFFSHORE AS ET AL                               SECTION: "H"(5)

ORDER AND REASONS

Before the Court are Third Party Defendant Petrolis SA's Motion for Summary Judgment (Doc. 49) and Defendant TVT Offshore AS's Motion for Summary Judgment (Doc. 50). For the following reasons, these motions are DENIED.

BACKGROUND

**I. Factual Background**

This consolidated action involves personal injury claims[1] and indemnity claims arising out of an incident that occurred aboard the BW PIONEER. The

---

[1] The personal injury claims have settled.

1

BW PIONEER is a floating, production, storage, and offloading unit (FPSO) owned by Plaintiff BW Offshore, LLC ("BW") and used to produce oil and gas from the Chinook and Cascade oil fields in the Gulf of Mexico. Two contracts are at issue in this case. On November 22, 2013, Defendant TVT Offshore (TVT) entered into a Master Service Agreement ("MSA") with BW for, inter alia, providing manpower related to the BW PIONEER. Separately, TVT entered into a Service Agreement ("Agreement") with Third-Party Defendant Petrolis, in which Petrolis would, at TVT's request, contract with qualified individuals and send them to work on various offshore jobs on an "as-required" basis. Both contracts contained mutual indemnity clauses.

Pursuant to the MSA, BW requested TVT provide qualified riggers and rope access technicians for an umbilical pull-in and to change the boarding shut-down valves ("BSDVs") on the BW PIONEER. In turn, TVT asked Petrolis to provide these workers per the terms of the Agreement. Plaintiff Louis de Jager, was contracted to fill one of the spots on a rope access technician and rigger team. While the team was detaching and lowering a "spool piece" for the BSVD assembly, the spool piece fell to the deck, crushing de Jager's leg, which was traumatically amputated.

**II. Procedural History**

De Jager filed suit for personal injuries in Louisiana state court, naming BW as defendant. That action was removed to the Middle District of Louisiana and subsequently transferred to this Court. After removal, de Jager amended his complaint to add TVT as a defendant. Separately, BW filed suit against

TVT in this Court, seeking indemnity and alleging that TVT violated the MSA. After de Jager's suit was transferred to this District, these actions were consolidated before this Court. Both TVT and BW filed third-party complaints against Petrolis, seeking defense and indemnity for the claims asserted in de Jager's suit.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2] A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[4] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[5] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish

---

[2] Fed. R. Civ. P. 56(c) (2012).
[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[4] *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir. 1997).
[5] *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995).

the existence of an element essential to that party's case."[6] "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[7] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[8] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[9]

## LAW AND ANALYSIS

Petrolis and TVT have both filed motions for summary judgment seeking dismissal of the contractual indemnity claims against them. They argue that the Outer Continental Shelf Lands Act (OCSLA) requires the Court to apply Louisiana law to the contracts at issue. They further argue, based on an application of Louisiana law, that the Louisiana Oilfield Indemnity Act ("LOIA") nullifies the indemnity provisions of their respective contracts as contrary to public policy. TVT also alleges that the MSA is not enforceable due to its vagueness. Petrolis opposes both Motions, arguing that maritime law

---

[6] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).
[7] *John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).
[8] *Badon v. R J R Nabisco, Inc.*, 224 F.3d 382, 394 (5th Cir. 2000) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).
[9] *Boudreaux v. Banctec, Inc.*, 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

governs this dispute. TVT opposes Petrolis's Motion, arguing that, though Louisiana law applies, Petrolis's duty to indemnify is not barred by the LOIA. These motions turn on which law applies to the contracts at issue.

Under OCSLA, three conditions must be met for adjacent state law to apply as a surrogate to federal law: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law."[10] If the second factor is met and maritime law applies of its own force, the remaining factors are moot to the choice of law inquiry.[11] Maritime law applies of its own force if the MSA and the Agreement are maritime in nature.[12] In order to appropriately consider whether the contracts are maritime, the Court must first determine whether the BW PIONEER is a vessel.[13] Accordingly, the Court considers the BW PIONEER's vessel status first. The Court will then apply that finding in analyzing whether the contracts are maritime.

### I. Vessel Status of the BW PIONEER

Both Petrolis and TVT argue that the BW PIONEER is not a vessel. "The word 'vessel' includes every description of watercraft or other artificial

---

[10] *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990).

[11] *See Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778, 789 n. 9 (5th Cir. 2009).

[12] *Id.*

[13] *See Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538 (5th Cir. 1986) ("A principal determinant is the relation the contract 'bears to the ship.... A contract relating to a ship in its use as such, or to commerce ... is subject to maritime law.'").

contrivance used, or capable of being used, as a means of transportation on water."[14] A structure is not included in this definition "unless a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water."[15] Something may be a vessel even if its primary purpose is not transportation as long as its use as a means of transportation remains a practical possibility, not merely a theoretical one.[16] Indeed, "a structure may qualify as a vessel even if it attached—but not permanently attached—to the land or ocean floor."[17]

Longstanding precedent in this circuit establishes that mobile offshore drilling units are vessels under general maritime law.[18] In the early case of *Offshore Co. v. Robinson*, the Fifth Circuit held that a floating drilling platform is a vessel, despite the fact that it was not self-propelled and that its primary purpose was oil drilling.[19] More recently, in *Demette v. Falcon Drilling Co, Inc.* the court found it "beyond dispute" that a jack-up rig was a vessel under maritime law.[20] Likewise, a Court in this district recently found that the

---

[14] 1 U.S.C. § 3.
[15] *Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735, 741 (2013).
[16] *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 496 (2005).
[17] *Lozman*, 133 S. Ct. at 742.
[18] *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d 943, 949 (E.D. La. 2011) *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014).
[19] 266 F.2d 769, 779 (5th Cir. 1959).
[20] *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 498, n. 18 (5th Cir. 2002) *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009). A jack-up rig has legs that can be lowered into the seabed. Once the legs are

DEEPWATER HORIZON, a dynamically positioned, semi-submersible, deep-water drilling platform, was a vessel, citing the fact that it was only attached to the wellhead by a 5,000-foot string of drill pipe.[21]

There is no disagreement among the parties regarding the characteristics of the BW PIONEER. The parties disagree, however, as to whether these features qualify it as vessel. In examining these characteristics, the Court finds that the BW PIONEER bears even more resemblance to the traditional notions of a vessel than the structures at issue in the above cases. It is "ship shaped" and built on the base of a converted oil tanker.[22] It maintains a full marine crew and flies the flag of Bermuda. Importantly, it retains its own propulsion system and can detach itself from the well and relocate under its own power in as little as six hours.[23] Though its primary purpose is oil production, this fact is not dispositive to its status as a vessel.[24]

Movants cite the Court to several cases involving spars in support of their argument that FPSOs such as the BW OFFSHORE are not a vessels. Spars are large oil production platforms that float on the ocean's surface but are moored to large anchors in the seabed. Courts have repeatedly found that

---

secured the rig is "jacked-up" out of the water to create a drilling platform. The process is reversible, and a jack-up rig can be towed to new sites. *Id.* at 495.

[21] *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d 943, 950 (E.D. La. 2011) *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014).

[22] Doc. 49-5.

[23] Doc. 49-6.

[24] *See Stewart*, 543 U.S. 481, 496 (2005) (holding that the *Super Scoop* used to dig a tunnel in Boston Harbor was a vessel, despite having excavation as its primary function).

these structures are not vessels, citing their limited movement capabilities, the time and expense necessary to render such a structure capable of marine transport, and the permanence of their attachment to the sea floor.[25] In *Mendez v. Anakarko,* for example, the court emphasized that relocation of the spar would take nearly two months at a cost of $42 million and would require the construction of a new mooring system at the new site.[26] The court held that spar was not a vessel, as it was at most "theoretically capable of maritime transportation but not practically capable."[27] By contrast, FPSOs, such as the BW PIONEER, are not only practically capable of maritime transport, but are imminently capable of such. They can detach from the well and relocate under their own power within six hours, transporting the crew, equipment, and stored oil along with them. This stands in stark contrast to the logistical hurdles presented by the relocation of a spar. The spar cases are therefore inapposite to the matter currently before the Court.

Movants also argue that the fact that the BW PIONEER has not moved from its location since 2009 should indicate to this Court that it is not a vessel. This argument is not persuasive. This circuit has repeatedly rejected the idea that a vessel loses its status merely because it is taken out of navigation.[28] For instance, a jack-up rig remains a vessel while in position and lifted out of the

---

[25] *See, e.g., Fields v. Pool Offshore, Inc.,* 182 F.3d 353, 358 (5th Cir. 1999); *Warrior Energy Servs. Corp. v. ATP Titan M/V*, 551 F. App'x 749, 752 (5th Cir. 2014); *Mendez v. Anadarko Petroleum Corp.*, 466 F. App'x 316, 319 (5th Cir. 2012).
[26] *Mendez v. Anadarko Petroleum Corp.*, 466 F. App'x 316, 319 (5th Cir. 2012).
[27] *Id.*
[28] *Demette,* 280 F.3d at n.18.

water.[29] Here, the BW PIONEER is even more readily capable of being placed in navigation than a jack-up rig. The fact that it has not moved from location since 2009 is of no legal significance in this matter.

For these reasons, the Court finds that the BW PIONEER is a vessel.

## II. Applicability of State Law Through OCSLA

Having found that the BW PIONEER is a vessel, the Court must apply that determination in analyzing whether state law applies to this dispute. As noted above, under OCSLA, three conditions must be met for adjacent state law to apply as a surrogate to federal law: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law."[30] If the Court determines that the contract is maritime, the remaining factors are moot to the choice of law inquiry.[31] Accordingly, the Court will now decide whether the MSA and the Agreement are maritime contracts.

A contract is maritime if it has a "genuinely salty flavor."[32] "Determination of the nature of a contract depends in part on historical

---

[29] *Id.*
[30] *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990).
[31] *See Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778, 789 n. 9 (5th Cir. 2009).
[32] *Kossick v. United Fruit Co.*, 365 U.S. 731, 742 (1961)

treatment in the jurisprudence and in part on a fact-specific inquiry."[33]  Where, as here, the contractual arrangement involves a blanket contract followed by later work orders, the two "must be interpreted together in evaluating whether maritime or land law is applicable to the interpretation and enforceability of the contract's provisions."[34]  In *Davis & Sons, Inc. v. Gulf Oil Corp.*, the Fifth Circuit indicated that, in addition to looking at the historical jurisprudential treatment of similar contracts, courts should consider six factors in making such a fact-specific determination:

> 1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters; 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?[35]

Historically, the jurisprudence has established that "[o]il and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce."[36]  Courts have repeatedly held that a contract to supply personnel to work on special purpose vessels are maritime contracts.[37]

---

[33] *Davis & Sons, Inc. v Gulf Oil Corp*, 919 F.2d 313, 316 (5th Cir. 1990).
[34] *Id.* at 315.
[35] *Id.* at 316.
[36] *Theriot v. Bay Drilling Corp.* 783 F.2d 527, 538–39 (5th Cir. 1986).  *See also In Re Oil Spill by the Oil rig Deepwater Horizon*, 808 F. Supp. 2d at 951 (holding that the operations of the DEEPWATER HORIZON bore a substantial relationship to traditional maritime activity).
[37] *See, e.g., Thibodeaux v. Vamos Oil & Gas Co.*, 487 F.3d 288, 294 (5th Cir. 2007) (holding that MSA to provide workers on an inland drilling barge was a maritime contract);

The *Davis* factors further support a finding that the contracts are maritime in nature. The first factor requires the Court to consider the work order in effect at the time of the contract. BW's work order to TVT for the time of the incident requests riggers to "assist on changing the BSDV aboard the BW PIONEER."[38] The terms of the MSA further support this conclusion, as it applied only to the vessel. As to the Agreement, though there is no written work order to Petrolis, it is undisputed that for this particular job they were to supply workers aboard the BW PIONEER.

Under the second factor the Court must analyze what work was actually performed by the crew assigned under the contract. It is undisputed that the crew was assigned to perform oil and gas services aboard a vessel, an activity that courts have found to be maritime.[39] Specifically, the rigging crew was retained to perform an "umbilical pull-in" on the vessel, required for its continued oil and gas exploration.

Third, the Court must look to whether the crew was assigned to work aboard a vessel in navigable waters. It is undisputed that the crew was assigned to work aboard the BW PIONEER in the navigable waters of the Gulf of Mexico. As discussed extensively above, the BW PIONEER is a vessel. This factor is therefore indicative of the maritime nature of the contract.

---

*Lewis v. Glendel Drilling Co.*, 898 F.2d 1083, 1086 (5th Cir. 1990) (holding that a contract to supply offshore drilling services need not specifically reference a vessel to be maritime).
[38] Doc. 49-13.
[39] *See, e.g., Thibodeaux*, 487 F.3d at 294.

The fourth factor asks the Court to consider to what extent the work being done related to the mission of the vessel. The record is clear that the work involved an umbilical pull-in, a task essential to the vessel's continued oil and gas operations. The work performed therefore related to the mission of the vessel.

The fifth factor directs the Court to consider the principal work of the injured worker. The record indicates that the principal work of de Jager was to work as a "rope access supervisor" aboard the vessel. This factor further indicates that the contract is maritime in nature.

The sixth and final factor directs the Court to consider what work the injured worker was performing at the time of the injury. The record indicates that de Jager was working on deck when the incident occurred. The record does not, however, indicate precisely what de Jager was doing on deck at the time of the incident. Even assuming that this factor would militate in favor of finding the contracts to be land-based, this is insufficient to overcome the fact that the remaining factors indicate that the contracts are maritime in nature.

The analysis of these factors indicates that the MSA and the Agreement are maritime in nature. Because maritime law applies of its own force, state law cannot apply through OSCLA. The LOIA is therefore inapplicable to this suit, and cannot be used as a basis to nullify the indemnity agreements in the contracts.

**III. The MSA is not "Hopelessly Vague"**

Finally, in its Motion, TVT argues that the MSA is hopelessly vague and ambiguous and cannot be enforced as a matter of law.  They aver that the contract fails to define the term "Owner's Group," used in the indemnity clause.  A plain reading of the contract, however, shows that this term is clearly defined in paragraph 11.2.[40]  Though paragraph 13.2 references paragraph 10.2 for a definition of the "Owner's Group," this is an obvious typographical error.  This argument is therefore without merit.

## CONCLUSION

For the foregoing reasons, Petrolis's Motion for Summary Judgment (Doc. 49) and TVT's Motion for Summary Judgment (Doc. 50) are DENIED.

New Orleans, Louisiana this 13th day of November, 2015.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[40] Doc 49-8 ¶11.2.